UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| GEORGIA FORESTWATCH, | ) | Civil Action No.: 8:12-CV-3455-BHH |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | **Opinion and Order** |
| RICK LINT, in his official capacity as | ) | |
| Supervisor of the Francis Marion and | ) | |
| Sumter National Forests, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on the plaintiff's motion for summary judgment on the administrative record (ECF No. 52) and the defendants' cross-motion for judgment on the administrative record (ECF No. 54). For the reasons set forth in this order, the defendants' cross-motion for judgment on the administrative record is granted, and the plaintiff's motion for summary judgment is denied.

The Court has reviewed Judge Mary G. Lewis' Amended Order and Opinion in the case of *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL (ECF No. 275). That decision was appealed and affirmed by the United States Court of Appeals for the Fourth Circuit in *American Whitewater v. Tidwell*, 770 F. 3d 1108 (4th Cir. 2014). The documents contained in the Administrative Record[1] in this case are the same as those contained in the Administrative Record in that related case. As such, relevant portions of Judge Lewis' factual summary are provided below. [2]

---

[1] Hereinafter, the Administrative Record will be referenced as "AR."
[2] The Court has reviewed the plaintiff's Motion to Strike Portions of Federal Defendant's Motion for Summary Judgment (ECF No. 57) and the subsequent briefing by the parties (ECF Nos. 59, 64). The Court finds plaintiff's arguments that defendants have improperly relied upon and cited to *Am. Whitewater*

## BACKGROUND

The Chattooga is one of the longest and largest free-flowing mountain waterways in the Southeast remaining in a relatively undeveloped condition. (AR001:00009). The river, which is 57 miles long, originates in western North Carolina and flows south to form the border of northwestern South Carolina and northeastern Georgia. (AR350:14358-14359). The waters of the Chattooga run through the Nantahala, Chattahoochee-Oconee, and Sumter National Forests ("NFs") before eventually descending into Georgia's Tugaloo Reservoir. (AR002:00186). On June 15, 1971, the Forest Service issued the Wild and Scenic River Study Report for the Chattooga River ("1971 Study") providing descriptions of the river and adjoining lands and outlining several recommendations and considerations for Congress prior to the river's designation as a WSR. (AR001:00001-00185).

In 1974, Congress designated the entire Chattooga River and its 15,432 acre corridor as a part of the Wild and Scenic Rivers System ("WSRS") under the Wild and Scenic Rivers Act ("WSRA") (16 U.S.C. §§ 1274(a)(10)-1287) based on the 1971 Study. (AR400:16697; AR001:00001-00185). Under this designation, the river was and is protected as a valuable natural resource to be preserved for present and future use.

v. Tidwell ("*American Whitewater I*"), 959 F. Supp. 2d 839 (D.S.C. 2013), and *Am. Whitewater v. Tidwell* ("*American Whitewater II*"), 770 F. 3d 1108 (4th Cir. 2014), unpersuasive. To the extent the defendants have asserted a *res judicata* defense in their Motion for Judgment on the Administrative Record, an assertion by the plaintiff with which the Court disagrees, the Court has not relied on the *American Whitewater* cases in that fashion, nor has it considered the defendants arguments in that way. Common sense dictates that straightforward conclusions regarding the adequacy of the 2012 Decisions drawn in those cases should be, and have been, considered by the Court for their precedential and persuasive value. This is especially true given that: 1) the plaintiff joined in a Motion to Consolidate the instant case with *American Whitewater I*, averring that the cases involved common questions of law and fact (ECF No. 8); 2) the Administrative Record in this case is identical to that in the *American Whitewater* cases (ECF No. 39); and, 3) the plaintiff filed an Unopposed Motion to Stay the instant case in order to permit appellate resolution of *American Whitewater II*, arguing that "[w]hile the issues in the *American Whitewater* case are not identical to the present case, there are a number of similarities in the issues before the Fourth Circuit" and "resolution of the *American Whitewater* case on appeal may impact and/or narrow significantly the issues to be litigated in the present action" (ECF No. 43 at 1).

*See* 16 U.S.C. § 1271. Portions of the Chattooga WSR Corridor are located within three states – North Carolina, South Carolina, and Georgia (AR002:00186), and can be divided into six distinctive sections under the "Guidelines for Evaluating Wild and Scenic River Areas Proposed for Inclusion under the National Wild and Scenic Rivers System." (AR001:00072). Section I of the Chattooga WSR covers 5.5 miles of the Headwaters from 0.8 miles below Cashiers Lake to 0.2 miles above Norton Mill Creek. (AR001:00072-00075). Section II of the Chattooga WSR covers 15.9 miles beginning 0.2 miles above Norton Mill Creek to Nicholson Fields. (AR001:00075-00077). Section III of the Chattooga WSR covers 6.1 miles of the river from Nicholson Fields to 2 miles below the Highway 28 Bridge at Turnhole. (AR001:00077-00078). Sections IV through VI of the Chattooga WSR are located on the lower portion of the river. (AR001:00078-00080). Under the WSRA, the USDA is in charge of managing the Chattooga in compliance with the Act, and the USDA primarily executes its management responsibilities through the Forest Service. *See* 16 U.S.C. § 1281(d).

On March 22, 1976, the Forest Service published its Chattooga Wild and Scenic Development Plan[3] in the Federal Register ("1976 Plan"), in an effort to manage the resources available at and around the Chattooga. (AR002:00186-00096). Over the years, the Forest Service has enacted various Plans for the management and oversight of the Chattooga WSR, the relevant portions of which are summarized hereafter.

**The 1976 Plan**

The 1976 Plan allowed non-motorized boating on the lower two-thirds of the Chattooga, but prohibited all boating on the Headwaters. (AR002:00191;

---

[3] The terms "Plan," Land Resource Management Plan or "LRMP," "Decision," and "Decisions" are used interchangeably in this order.

AR400:16697). In 1978, the Forest Service promulgated final regulations (36 C.F.R. § 261.77) which prohibited all private and commercial boating on the Chattooga River on the Georgia and South Carolina portions except where permits were provided by the Forest Service. (AR400:16758). The summary of the agency action indicated that permits would "include conditions of use to protect river values and provide for floater safety." *See* Permits for Chattooga River, 43 Fed. Reg. 3706-01 (Jan. 27, 1978) (codified at 36 C.F.R. pt. 261).

**The 1985 Plan**

The 1985 Sumter Forest Land Resource Management Plan ("1985 Plan"), like the 1976 Plan, allowed floating on the lower two-thirds of the Chattooga and precluded floating on the Headwaters. (AR006:00301-00019). The 1985 Plan provided that "[f]loating is limited to the 26 mile portion below Highway 28 Bridge and the West Fork's lower 4 miles in Georgia" and would be prohibited on the Headwaters. (AR007:00322). The 1985 Plan also established that administrative responsibility for the Chattooga was divided among the supervisors for the three relevant National Forests. (AR007:00324).

**The 2004 Plan**

In 2002, the Forest Service approved an amendment to the 1985 Plan which altered some of the provisions regarding boating on the lower portion of the river, but this amendment did not propose any changes to the provisions for the Headwaters. (AR400:17146). Then, on April 7, 2003, the Forest Service released a Draft Environmental Impact Statement ("DEIS") for a revised plan. (AR019:01171). The DEIS proposed altering some of the provisions regarding boating on the lower portion of the river, but maintained the boating prohibition on the Headwaters. (AR021:01929-01930).

The Regional Forester, who reports to the Chief of the Forest Service and manages one of nine geographic regions of the National Forest System, signed a Record of Decision ("ROD") in January 2004 that adopted the Revised Forest Plan ("2004 Plan"). (AR021:01914-01942); 36 C.F.R. § 200.2. In April 2004, a national non-profit organization called American Whitewater lodged an administrative appeal of the 2004 Plan that banned floating on the Headwaters. (AR025:01951-02045). Thereafter, on April 28, 2005, the Forest Service's Reviewing Officer granted American Whitewater's administrative appeal and explained that:

> After careful review of the record . . . I am reversing the Regional Forester's 2004 Decision to continue to exclude boating on the Chattooga [Headwaters]. I find the Regional Forester does not provide an adequate basis for continuing the ban on boating above Highway 28. Because the record provided to me does not contain the evidence to continue the boating ban, his decision is not consistent with the direction in Section 10(a) of the WSRA or Sections 2(a) and 4(b) of the Wilderness Act or agency regulations implementing these Acts.

(AR054:02120).

The Forest Service's Reviewing Officer directed the Regional Forester to reassess the boating prohibition as part of a broader examination of visitor use capacity issues on the upper segment of the Chattooga and required the Regional Forester to conduct appropriate visitor use capacity analyses, including an analysis of noncommercial boating use. (ARO54:02120-02121). Based upon the results of the visitor use capacity analysis, the Regional Forester was required to adjust or amend, as appropriate, the 2004 Plan to reflect a new decision based on the findings. *Id.* Due to the Forest Service's appeals procedures, the pre-existing prohibition on boating above Highway 28 set forth in the 1985 Plan remained in effect pending the results of the visitor use capacity analysis. (AR054:02120).

**The 2009 Plan**

Over the next few years, the Forest Service conducted a visitor use capacity analysis and other studies, held public meetings, and solicited public comment on recreation along the Chattooga. (AR400:16763-16765; *see also* AR400:16702-16706). The Forest Service received over 3,000 comments on the studies and proposed plan amendments (AR400:16705), and issued an Environmental Assessment ("EA") on Managing Recreation Uses on the Upper Chattooga River in August 2009. (AR224:09716-09915). On August 25, 2009, the Forest Supervisors for the Sumter, Chattahoochee-Oconee, and Nantahala National Forests signed a Decision Notice and Finding of No Significant Impact ("DN/FONSI") to amend their respective Land Resource Management Plans ("LRMPs") ("the 2009 Plan"). (AR221:09661; AR222:09679; AR223.1:09699). The 2009 Plan allowed limited non-motorized, non-commercial boating or floating on the Headwaters for the first time since the Chattooga's designation as a WSR. Floating was limited to a seven-mile long section starting at the confluence of Norton Mill Creek in North Carolina south to Burrells Ford Bridge in South Carolina (not including the tributaries) during the months of December, January and February when the river was flowing at levels of 450 cubic feet per second ("cfs") or higher. (AR221:09661; AR224.0:09731).

American Whitewater and others brought administrative appeals challenging the 2009 Plan. On October 14, 2009, and prior to the Forest Service's final decision on those appeals, American Whitewater also filed suit challenging the 2009 Plan. American Whitewater alleged in its complaint that the Forest Service's actions violated the Administrative Procedure Act ("APA"), the WSRA (16 U.S.C. § 1271 *et seq.*), the

Wilderness Act (16 U.S.C. § 1131 *et seq.*), the Multiple-Use Sustained-Yield Act ("MUSYA") (16 U.S.C. § 528 *et seq.*), the National Forest Management Act ("NFMA") (16 U.S.C. § 1600 *et seq.*) and its implementing regulations (36 C.F.R. §§ 219.1-219.29), the National Environmental Policy Act ("NEPA") (42 U.S.C. §§ 4321-4370) and its implementing regulations (40 C.F.R. §§ 1500-1508), United States Forest Service regulations and decisions, and the United States Constitution. *See American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL (ECF No. 1). The gravamen of American Whitewater's suit, and their quarrel with the 2009 Plan, was that the proposed changes to floating restrictions were not liberal enough. They sought a comprehensive lift of the longstanding ban on recreational floating on the entire Headwaters.

On December 18, 2009, a few days before the deadline to file an answer in the *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL case, the Forest Supervisors for the Sumter, Chattahoochee-Oconee, and Nantahala National Forests withdrew the 2009 Plan. (AR330:13403). The Reviewing Officer dismissed the pending administrative appeals on the same date based on the withdrawal of the 2009 Plan. (AR331:13406). With the 2009 Plan withdrawn, the pre-existing prohibition on boating on the Headwaters remained in effect.

On December 9, 2010, the Forest Service released a "scoping letter," thereby reinitiating the National Environmental Policy Act ("NEPA") process that began in the years leading up to the establishment of the 2009 Plan. (AR338.0:20990-92). The letter asked the public to identify any new information or concerns the Forest Service should analyze with regard to recreation on the Headwaters. The letter noted that comments previously submitted between 2005 and 2009 would be considered in the decision-

7

making process. *Id.* The Forest Service received additional comments during the 2010

scoping period. (AR400:16706). The Forest Service also provided the pre-decisional EA

to the public and received further comments during the six-week comment period. *Id.*

On August 31, 2011, plaintiff sought leave to intervene in *American Whitewater v.*

*Tidwell*, C/A No. 8:09-CV-2665-MGL, alleging a "direct and legally protectable interest in

the Forest Service's management policy at issue." *See Id.* (ECF No. 139 at 2). On May

1, 2012, the court granted plaintiff's motion to intervene for the "limited purpose of

defending against American Whitewater's claims for declaratory and injunctive relief."

*Id.* (ECF No. 168).

**The 2012 Plan**

In January 2012, the Forest Service issued an EA for Managing Recreation Uses

in the Upper Segment of the Chattooga Wild and Scenic River Corridor. (AR400:16692-

17192). Within this EA, the Forest Service developed several alternatives that would

preserve the Chattooga's free flowing condition, protect its water quality and "protect

and enhance" its specific ORVs as required by the WSRA. (AR400:16699-16718). All

alternatives:

> [p]reserve the Chattooga WSR's free-flowing condition, protect its water
> quality and protect its ORVs as required by the WSRA. All alternatives
> also preserve the wilderness character of Ellicott Rock Wilderness as
> required by the Wilderness Act. However, the alternatives vary the type
> and amount of recreation use, as well as other management actions, on
> different reaches of the upper river segment to assess the trade-offs of
> providing different mixes of high-quality recreation opportunities. The
> scope of the alternatives is limited to providing management direction for
> the upper segment of the Chattooga WSR, consistent with the appeal
> decision described in the purpose and need.

(AR400:16718).

The Forest Supervisors for the three affected National Forests each signed a

DN/FONSI based on the revised EA in January 2012 ("2012 Decisions"). (AR402:17195-17197; AR403:17224-17226; AR404:17252-17279). On June 28, 2012, the Reviewing Officer for the Forest Service denied all administrative appeals and affirmed the Forest Supervisors' 2012 Plan. (AR533:26117-26178 (American Whitewater); AR535:26188-26189 (Georgia ForestWatch)). On August 13, 2012, the Forest Service declined discretionary review of the 2012 Plan. (AR545:26425 (Georgia ForestWatch); AR547:26427 (American Whitewater)). The August 13, 2012 letters constituted final agency action for the 2012 Plan.

The 2012 Plan retains the prohibition on commercial boating above the Highway 28 Bridge but allows for non-motorized, non-commercial boating on the Headwaters on approximately 17 miles of the 21-mile main stem of the upper segment of the Chattooga WSR from the Green Creek confluence downstream to a designated take out within one-quarter mile downstream of the Lick Log Creek confluence. (AR404:17258). Boating is allowed for five months of the year between December 1 and April 30 during daylight hours when flows reach 350 cfs or greater at the USFS Burrells Ford gauge. (AR404:17258). The 2012 Plan also requires boaters to self-register before floating on the Headwaters at kiosks at four trail head locations: Green Creek, Norton Mill Creek, Bullpen Bridge, and Burrells Ford Bridge. (AR400:17102 (implementation of Alternative 13A[4]); AR467:20110). Boating groups on the Headwaters are limited to a maximum group size of six people and a minimum group size of two boats. (AR404:17272).

**Procedural History**

On December 6, 2012, plaintiff filed suit alleging that the Forest Service's actions

---

[4] Alternative 13A is one of several proposed alternatives developed by the Forest Service, and analyzed within the 2012 EA, to protect and enhance the Chattooga's ORVs.

violated the APA (5 U.S.C. § 701, *et seq.*), the WSRA (16 U.S.C. § 1271 *et seq.*), the NEPA (42 U.S.C. §§ 4321-4370(d)) and its implementing regulations (40 C.F.R. §§ 1500-1517.7), and 36 C.F.R. § 261.77. (ECF No. 1). On December 18, 2012, plaintiff and defendants filed a Joint Motion to Consolidate the instant case with *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL. (ECF No. 8). American Whitewater objected to the consolidation, and the Court subsequently denied the joint motion. (ECF No. 19). Plaintiff then sought a preliminary injunction restraining and enjoining defendants from taking any actions toward implementing the 2012 Plan, claiming that the new allowances for recreational floating posed risks of irreparable harm to Georgia ForestWatch and its members if they were implemented before further studies and analysis were completed. (ECF No. 10). However, on April 16, 2013, the court in *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL granted the Federal Defendants' Motion for Judgment on the Administrative Record (ECF No. 261), leading plaintiff and defendants in the instant case to file a Joint Motion to Stay (ECF No. 23) in order to evaluate the impact of that result and pursue potential alternatives to litigation. The Court granted the motion to stay (ECF No. 24) and issued a text order finding plaintiff's motion for a preliminary injunction moot (ECF No. 26).

On August 29, 2013, pursuant to the motion of the parties, the Court issued a Consent Order lifting the stay. (ECF No. 29). Plaintiff filed their Amended Complaint on September 19, 2013, asserting the same causes of action as their initial complaint, but refining and narrowing their reasoning and theories of liability. (ECF No. 35). However, the first cause of action from their initial complaint, alleging violation of the WSRA (16 U.S.C. § 1271 *et seq.*), was now broken into two separate causes of action – one

regarding the Forest Service's alleged failure to prevent degradation of ORVs (adding a reference to NFMA as a source of liability), the other regarding an alleged failure to set enforceable capacity limits. *Id.* at 17-18.

A subsequent stay was later granted pursuant to plaintiff's unopposed motion (ECF No. 43) in order to allow the appeal of *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL to be resolved before the United States Court of Appeals for the Fourth Circuit. On November 15, 2014, the Fourth Circuit affirmed the judgment of the district court. *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1122 (4th Cir. 2014). On February 6, 2015, plaintiff filed their Motion for Summary Judgment on the Administrative Record. (ECF No. 52). The defendants submitted their Response in Opposition and Cross-Motion for Judgment on the Administrative Record on March 27, 2015. This case involves a complicated interplay of contemporaneously noble, yet contradictory views on how the Chattooga River ought to be managed, not only of the parties to the litigation, but of the public writ large. The Court appreciates the diligent briefing and principled ideals of both parties.

## STANDARD OF REVIEW

Judicial review of federal agency action is made available through the APA. 5 U.S.C. §§ 701-706; *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The party seeking review under the APA must show that he has "suffer[ed] legal wrong" because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990). Further, the party challenging the agency action must set forth specific facts to show that it is entitled to relief. *Id.* at 884.

In the recent and related case of *Am. Whitewater v. Tidwell*, 770 F.3d 1108 (4th Cir. 2014), the United States Court of Appeals for the Fourth Circuit reiterated established principles regarding judicial review of federal agency action under the APA. *Id.* at 1115. Such review under the APA is "ultimately narrow and highly deferential." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012). A court may set aside an agency's action under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006). In determining whether an agency action runs afoul of that standard, a reviewing court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012) (alteration in original) (*quoting F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). So long as the agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," its decision should be sustained. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). A reviewing court need be particularly deferential when "resolution of th[e] dispute involves primarily issues of fact" that implicate "substantial agency expertise," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989), and the agency is tasked with balancing often-competing interests. *See Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1182 (9th Cir. 2000). Nonetheless, the court will vacate an agency's decision if it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

## DISCUSSION

In five causes of action, plaintiff Georgia ForestWatch claims that the Forest Service has violated federal law by way of its management decisions with respect to allowing boating on the Headwaters of the Chattooga River. The plaintiff invokes the APA, WSRA, NEPA, NFMA, and the Forest Service's own access regulations. These matters are now before the Court by way of Motions for Judgment on the Administrative Record.

## I. WILD AND SCENIC RIVERS ACT

Congress enacted the WSRA, codified at 16 U.S.C. § 1271 *et seq.*, in 1968 to help protect rivers of the United States from over development and damming. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1027 (9th Cir. 2008). The WSRA's opening section states:

> [C]ertain selected rivers . . . which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271; *Friends of Yosemite Valley*, 520 F.3d at 1027. In order to be designated as wild, scenic, or recreational under the WSRA, a river must "possess one or more of the values" itemized in section 1271. *See* 16 U.S.C. § 1273(b). Once designated under the WSRA, a particular river is managed by one of several administrative agencies in order to prevent degradation of their condition and preserve

13

their pristine quality. *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1113 (4th Cir. 2014). "The statutory command is twofold: the outstandingly remarkable values or 'ORVs,' that led Congress to designate the river must be 'protecte[d] and enhance[d],' while other uses may be limited if they substantially interfere with the public's use of those ORVs." *Id.* (*citing* 16 U.S.C. §§ 1271, 1281(a)) (alteration in original). In performing its statutory duties, the administering agency must prepare a Comprehensive Management Plan ("CMP") that addresses "resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of [the WSRA]." 16 U.S.C. § 1274(d).

The plaintiff makes four arguments to substantiate its claim that the Forest Service has violated the WSRA by way of its 2012 Decisions. First, the plaintiff argues that the Forest Service has no Comprehensive River Management Plan ("CRMP") in the form of a single, unified document and that the lack of such a CRMP led to inappropriate management decisions by three independent National Forests and Forest Supervisors rather than a single authority. Second, the plaintiff avers that the Forest Service has failed to establish adequate capacity limits as required by the WSRA. Third, the plaintiff claims that the adaptive management strategy in the 2012 Decisions is invalid because it relies upon a poor monitoring system that does not provide adequate information. Finally, the plaintiff argues that the 2012 Decisions violate the WSRA because they do not address past degradation, and encourage ongoing degradation of the Chattooga's ORVs. These arguments are each addressed below.

### A. The Requirement of a Comprehensive River Management Plan

The plaintiff contends that the Forest Service has axiomatically violated 16

U.S.C. § 1274(d)(2) because the 2012 Decisions amended three independent LRMPs, and there is no single, comprehensive document that addresses all of the necessary elements of impact on the entire Chattooga Corridor. In support of this contention, the plaintiff cites to *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1026, 1036-37 (9th Cir. 2008) for the notion that cross-referencing multiple management documents to, in effect, patch together a CRMP has been held insufficient to meet the requirements of the WSRA.

The defendants respond that the plaintiff's challenge to the 2012 Decisions on this front is both procedurally defective and incorrect on the merits. The defendants argue that the plaintiff lacks standing to challenge the absence of a single, stand-alone CRMP because the plaintiff has not shown that as a result of such absence: (1) they suffered an injury that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) their injury is fairly traceable to the challenged action of the defendants; and, (3) their injury will likely be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). On the procedural point, the defendants argue that courts "are not free to impose [their] own notions of procedural propriety upon the Forest Service" and "must be reluctant to mandate that a federal agency step through procedural hoops in effectuating its administrative role unless such procedural requirements are explicitly enumerated in the pertinent statutes or otherwise necessary to address constitutional concerns." *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990). Regarding the merits of the plaintiff's claim, the defendants cite the plain language of the statute for the

proposition that the WSRA expressly allows for incorporation of the CRMP into land and resource management planning. *See* 16 U.S.C. § 1274(d)(1). To require the CRMP to be contained in a separate, stand-alone document would, they assert, contradict the WSRA itself.  The Court agrees on all points.

First, the Court agrees with the defendants that, outside of conjecture, the plaintiff has not established any concrete, particularized, and actual/imminent injury from the lack of a single, stand-alone CRMP document. The plaintiff is of course free to disagree with the content and effects of the 2012 Decisions and argue that changes to the boating restrictions on the Headwaters of the Chattooga adversely impact their ability to enjoy this natural resource both now and in the future. But such adverse impact, if any, does not arise from the fact that the CRMP is incorporated into the LRMPs of the three National Forests. The Court cannot see how the plaintiff's perceived injury is traceable to the absence of an isolated, stand-alone CRMP document and does not believe that consolidation of the CRMP into such a format would remedy the perceived injury. *See Laidlaw*, 528 U.S. at 180–81. In the Court's opinion, any alleged injury from the specific fact that the CRMP is not an isolated, stand-alone document is at best speculative, and the plaintiff lacks standing on this issue.

Second, even assuming the plaintiff does have standing to challenge the purported absence of a CRMP, the procedural requirement borne by the Forest Service to prepare a CRMP for the Chattooga Corridor has been met. The Forest Service issued a CRMP for the Chattooga in 1980. (AR005:00236-37). During subsequent land and resource management planning, the CRMP was incorporated into the 1985 Sumter Forest Plan as Appendix M. (AR006:00305, AR007:00321-52). The Sumter National

Forest later revised its forest plan in 2004, and incorporated a revised CRMP in the "Management Prescriptions" portion of that plan. (AR020:01751-96). The management prescriptions for the Chattooga in the 2004 Sumter Forest Plan "constitute[] the comprehensive plan as required in Section 3(d)(2) of the Wild and Scenic Rivers Act" and are used by the Nantahala and Chattahoochee National Forests for management of the Chattooga within their respective forest boundaries. (AR020:01758; *see* AR235:10656-62 (Nantahala); AR236:11032 (Chattahoochee)). Moreover, those management prescriptions were developed in close cooperation between the three National Forests and designed for collective use. (AR019:01548). The dispersed management of the Chattooga Corridor is a feature of the river itself, and not a product of any unjustifiable arrangement adopted by the Forest Service. Neither the Forest Service writ large, nor the individual Forest Supervisors can change the fact that this precious natural resource flows through three different national forests in three different states. In this context, the Forest Service has adopted dispersed LRMPs that are designed to facilitate local management while incorporating a unified approach to the preservation and enhancement of the Chattooga's ORVs. Where, as here, the Forest Service has complied with the procedural requirements imposed by statute, the Court will not substitute its own notions of procedural propriety on the agency. *See Tyrrel*, 918 F.2d at 818.

Finally, regarding the merits of the plaintiff's claim, the Court agrees with the defendants that the Forest Service both has a CRMP for the Chattooga, and has properly incorporated that CRMP into the LRMPs for the three National Forests in question. One need look no further than the plain language of the WSRA to see that

precisely this type of arrangement is contemplated in the statute. "The [CRMP] *shall* be coordinated with and *may* be incorporated into resource management planning for affected adjacent Federal lands." 16 U.S.C. § 1274(d)(1) (emphasis added). The Court finds the plaintiff's reliance on *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) (*"Yosemite III"*) inapposite and unpersuasive as that case is clearly distinguished from the instant case on its facts. Unlike the National Park Service in *Yosemite III*, which attempted to rehabilitate a CRMP that the court had previously held wholly invalid by simply tacking on supplemental volumes addressing identified deficiencies, the Forest Service in this case maintains a single, comprehensive plan for river management. *See id.* at 1036-37. There is no per se requirement that a CRMP must be a single, stand-alone document, as such requirement would contradict the WSRA itself. *See* 16 U.S.C. § 1274 (d)(1). To the extent the holding in *Yosemite III* can be read to require such a single, stand-alone document, the Court finds such a reading to be overbroad as applied to all cases and all situations. Rather, the requirement of a single, stand-alone document is more appropriately limited to the specific facts of *Yosemite III*, which are divergent from the facts in this case.

After reviewing the arguments presented, the applicable law, and the administrative record, the Court concludes that the Forest Service has not violated the WSRA by failing to maintain a CRMP for the Chattooga Corridor. The plaintiff has not established a procedural violation of the WSRA or shown that the Forest Service's decision to incorporate the CRMP was arbitrary and capricious.

### B. The Adequacy of the User Capacity Study

Under the WSRA, agencies are required to prepare a CRMP to provide for the

protection of river values. 16 U.S.C. § 1274(d)(1). The CRMP shall address "resource protection, development of lands and facilities, *user capacities*, and other management practices necessary or desirable to achieve the [WSRA] purposes." *Id.* (emphasis added). In their second line of attack under the WSRA, the plaintiff argues that the Forest Service failed to establish valid capacity limits in the 2012 Decisions because the "guidelines" therein do not trigger management action before degradation occurs. Citing *Yosemite III*, the plaintiff asserts that user capacity limits must trigger management action before degradation occurs or they are invalid. *See Yosemite III*, 520 F.3d at 1034 ("A standard must be chosen that does in fact trigger management action before degradation occurs.") Because, they argue, the "guidelines" in the 2012 Decisions are merely advisory and would "never" require management action they cannot be valid capacity limits under the WSRA.

The defendants respond that the WSRA's requirement to address user capacity limits is procedural in nature, and the WSRA does not impose a substantive mandate as the plaintiff claims. *See Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1249 ("The second procedural requirement of WSRA is the planning requirement of Section 1274(d).") The defendants argue that the Forest Service has satisfied the WSRA regarding capacity limits because they have complied with the procedural requirement in 16 U.S.C. § 1274(d) through a number of steps taken during the planning process leading up to the 2012 Decisions. Ironically, the defendants rely on *Yosemite III's* interpretation of the statutory language, the same case that the plaintiff avers renders the Forest Service's efforts at capacity analysis for the Headwaters of the Chattooga invalid. "The plain meaning of the phrase 'address user capacities' is simply that the C[R]MP must deal

with or discuss the maximum number of people that can be received at a WSRS. However, the plain meaning does not mandate one particular approach to visitor capacity." *Yosemite III*, 520 F.3d at 1029 (alterations and internal quotation marks omitted). The defendants argue that the holding in *Yosemite III* should not be read so broadly as to impose a substantive requirement regarding user capacities that is not present in the WSRA itself. The Court agrees on all points.

The Administrative Record is replete with evidence of the Forest Service's efforts to conduct user capacity analysis. The Forest Service used both a limits of acceptable change ("LAC") process and numeric-focused capacity process, and pointed out in the EA that "[b]oth . . . processes have the same goal: protect river values by ensuring impacts do not exceed unacceptable levels." (AR400:16763-64). In a document titled "Upper Chattooga River Visitor Capacity Analysis Plan," the Forest Service laid out the planning framework to address user capacity issues. (AR155:20797-871). In a report entitled "Capacity & Conflict on the Upper Chattooga River," the Forest Service provided a concise review of capacity issues for the LAC process. (AR171:20679-84). The Forest Service reviewed literature, organized public meetings, received public comments, and conducted use estimation workshops. (*See e.g.*, AR163:03011-18 (literature review report); AR156:02713-16 (press release for July 7, 2006 public meeting); AR364:14941-57 (June 2011 use estimation workshop)). The EA incorporates the findings on user capacity in the form of tables throughout the section on the recreation ORV, and estimates existing use patterns for frontcountry and backcountry recreation. (AR400:16768-70). Each alternative examined in detail in the EA contains tables summarizing existing and projected user capacity. (*See, e.g.*, AR400:16827

(frontcountry user capacity for Alternative 13A); AR400:16829 (backcountry user capacities and encounter estimates for Alternative 13A)).

At its base, the plaintiff's main contention with the capacity analysis in this case appears to be that the Forest Service did not set enforceable capacity limits that trigger agency action before resource degradation occurs. However, there is no such requirement in the WSRA and the Court declines to read one into the statute. The plaintiff relies almost exclusively on the *Yosemite III* decision for the proposition that a lack of enforceable capacity limits render the capacity analysis in this case invalid. But the Court also declines to read *Yosemite III* as broadly as the plaintiff encourages. In *Yosemite III*, the court found that the National Park Service's user capacity study for the Merced River failed to satisfy the WSRA because it did not adopt "quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities." *Yosemite III*, 520 F.3d at 1030 (internal citations and quotation marks omitted). The *Yosemite III* court held that this "failure to provide any concrete measure of use" was "inconsistent with [its] interpretation of the phrase 'address . . . user capacities.'" *Id.* (internal citations and alterations omitted).

In the instant case, the Forest Service included precisely the numeric values and quantitative measures in its user capacity analysis for which the *Yosemite III* court was looking. (AR400:16763-65; *see* AR400:16766-16770 (existing and projected parking capacity, use levels, and average encounters)). Indeed, the Forest Service explicitly referenced the holding of *Yosemite III* in the EA, and addresses it in the user capacity analysis for the Chattooga. (AR400:16764) ("Chattooga initially placed greater emphasis on indicators and standards than numeric (use level) capacities. After the

2008 Merced decision [*Yosemite III*], and consideration of ongoing debate among river professionals, the agency recognized the need to explicitly identify numeric capacities as well."). Thus, the specific deficiencies identified by the United States Court of Appeals for the Ninth Circuit in the Merced River user capacity analysis helped to frame the content of the user capacity study for the Chattooga. The court concludes that the Forest Service's efforts regarding user capacity analysis comply with the statutory requirements and were neither arbitrary nor capricious.

It should be noted, that when American Whitewater challenged the same user capacity study in *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL, it too urged the district court to read a substantive requirement into the WSRA. The district court declined to do so and agreed with the Ninth Circuit that "the plain meaning of Section 1274(d) does not mandate one particular approach for the analysis of user capacity." *Am. Whitewater v. Tidwell*, 959 F. Supp. 2d 839, 855 (D.S.C. 2013) (internal quotation marks omitted). The district court held that the Forest Service's consideration of user capacity "satisfied the WSRA and was neither arbitrary nor capricious." *Id.* at 856. This Court has conducted an independent review of the capacity analysis and applicable law and finds no reason to disagree with the district court in the *American Whitewater* case.

### C. The Non-Degradation and Enhancement Requirement

The analyses for the third and fourth prongs of the plaintiff's claims under the WSRA run together, and the Court will address them simultaneously. In its third argument under the WSRA, the plaintiff contends that the adaptive management strategy ("AMS") in the 2012 Decisions is invalid because the monitoring that is

supposed to inform such management does not provide useful information regarding resource condition trends. This argument boils down to an assertion by the plaintiff that the AMS is poorly designed because it lacks appropriate information inputs to warn of degradation before it occurs. In their fourth argument, the plaintiff contends that the 2012 Decisions violate the WSRA because they do not address past degradation, and encourage ongoing degradation. They do this, the plaintiff argues, because they include only arbitrary, unenforceable capacity guidelines, encourage increased use of portions of the Chattooga that are already degraded, and direct users to engage in unsustainable practices that cause sedimentation, such as use of non-system trails. The plaintiff relies solely on *Yosemite III* for the proposition that the "protect and enhance" requirement of the WSRA imposes upon the Forest Service a duty to "address both past and ongoing degradation." *See Yosemite III*, 520 F.3d at 1035.

The defendants respond that the 2012 Decisions comply with the non-degradation and enhancement requirement of the WSRA. They argue that the 2012 Decisions will actually reduce cumulative sediment impacts in the Chattooga watershed and that the research presented in the EA shows as much. Furthermore, they argue, the plaintiff has not provided any legal support for the proposition that agency action cannot meet the non-degradation and enhancement requirements of the WSRA simply because there is a possibility that the action may cause some diffuse environmental effects such as increased visitor use or sedimentation. The defendants contend that the type of analysis within the 2012 Decisions that the plaintiff critiques in its WSRA claims is precisely of the sort that requires a high level of agency expertise to which a reviewing court must defer. The Court agrees entirely.

The WSRA requires that a river designated as wild and scenic "shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values . . . ." 16 U.S.C. § 1281(a). The "values" which lead to the inclusion of a river in the National WSR System are free-flowing condition, ORVs, and water quality. 16 U.S.C. § 1271. The joint Secretarial Guidelines between the Department of Agriculture and the Department of the Interior interpret the management principles of Section 1281(a) for these values "as stating a *nondegradation and enhancement* policy for all designated river areas, regardless of classification." *Nat'l Wild and Scenic Rivers Sys.; Final Revised Guidelines for Eligibility, Classification, and Mgmt. of River Areas*, 47 Fed. Reg. 39454, 39458 (Sept. 7, 1982) (emphasis added). "The WSRA requires the administering agency to manage each component so as to protect and enhance its ORVs, while providing for public recreation and resource uses which do not adversely impact or degrade those values." *Yosemite III*, 520 F.3d at 1028 (*citing* 47 Fed. Reg. at 39,458-59). "Congress left the requisite calibration to the Forest Service, providing in § 1281 that agency management plans may establish varying degrees of intensity for protection based on special attributes of a river, and the balance struck by the Forest Service . . . is entitled to substantial deference." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1118 (4th Cir. 2014) (internal quotations omitted).

The plaintiff invokes the "protect and enhance" requirement of the WSRA as the source for their substantive challenges to the mechanics of the 2012 Decisions (e.g. AMS, monitoring, capacity guidelines, etc.). But the "protect and enhance" requirement

is precisely the type of "broad statutory mandate" that the United States Supreme Court

has held is beyond the authority of a court, reviewing agency action under the APA:

> The principal purpose of the APA limitations we have discussed-and of the traditional limitations upon mandamus from which they were derived-is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with *broad statutory mandates*, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the *broad statutory mandate*, injecting the judge into day-to-day agency management.

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66-67 (2004) (emphasis added). In

effect, the plaintiff repeatedly asks this Court to substitute its own judgment for that of

the Forest Service on policy matters about which the Court lacks both expertise and

information. The Court declines to step outside its rightful role in the APA review

process and make substantive judgment calls about the prudence of particular policy

choices in the 2012 Decisions.

Even if one assumes that the plaintiff's various critiques of the 2012 Decisions

fall within the Court's purview on review, the Administrative Record provides ample

evidence for the Court to conclude that the Forest Service's actions did not violate the

APA. The determination of whether the Forest Service acted in an arbitrary and

capricious manner rests on whether it "'articulated a rational connection between the

facts found and the choice made.'" *See Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115

(4th Cir. 2014) (*quoting Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177,

192 (4th Cir. 2009). The Court is fully satisfied that such a connection was made by the

agency and articulated in the EA. Moreover, "Our review is particularly deferential when,

as is the case here, resolution of the dispute involves primarily issues of fact that implicate substantial agency expertise." *Id.* (*quoting Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989) (internal alterations and quotations omitted).

To reiterate, the values that led to the inclusion of the Chattooga in the National WSR System were its free-flowing condition, its ORVs, and its water quality. *See* 16 U.S.C. § 1271. The Court notes that the EA carefully examined each of these values and found that the policy changes in the 2012 Decisions would not negatively impact them. With regard to free-flowing condition, the EA states that "as required by the WSRA, at the time of designation, the Chattooga River was flowing in its natural condition without impoundment from Cashiers Lake south to Tugaloo Lake." (AR400:16956). The EA further notes that there are currently no impacts to the natural flows of the Chattooga for its entire length and that none of the proposed alternatives would impact this free-flowing condition. *Id.* With respect to ORVs, the EA prudently explores and discusses each of the Chattooga's ORVs, including its history, geology, biology, scenery, and recreation, and discusses the impact of each alternative on each of the ORVs. (AR400:16757-16955). The EA reports that it is not reasonably foreseeable that the selected alternative (Alternative 13A) would negatively impact any of the ORVs in a significant manner. *See id.* And with regard to water quality, the EA includes extensive analysis on sediment, water pollutants, and other potential detriments to this value. (AR400:16959-16963, 16993-17031). The EA finds that the direct, indirect, and cumulative effects of foreseeable activities resulting from Alternative 13A will continue to protect the water quality of the Chattooga. (AR400:16963-16964).

Therefore, to the extent that the "protect and enhance" mandate in Section 1281

can be read to enable the plaintiff's substantive critiques of the Forest Service's environmental analysis and conclusions, the Court finds that the Forest Service has complied with the non-degradation and enhancement requirement of the WSRA. There clearly was a rational connection between the facts found and the choices made, and the Forest Service's efforts were neither arbitrary nor capricious.

Finally, the plaintiff has failed to articulate how the AMS and resource monitoring adopted in the 2012 Decisions violates the WSRA's non-degradation and enhancement requirement. The WSRA contains no mandate that a managing agency adopt a particular management strategy and does not preclude the use of an AMS. *See* 16 U.S.C. §§ 1271-1287. The only authority the plaintiff invokes for their challenge to the AMS is the *Yosemite III* case. But *Yosemite III* dealt with questions regarding the adequacy of a user-capacity study, not with resource monitoring and an AMS. *See Yosemite III*, 520 F.3d at 1033-36. This Court does not read *Yosemite III* as creating a cause of action under the WSRA for every policy disagreement that a plaintiff might have with a federal agency managing a WSR. Such a reading is overbroad, and inapposite to the context of that case. In the end, "Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1996) (*citing Baltimore Gas & Electric v. Natural Res. Defense Council*, 462 U.S. 87, 100-01 (1983); *Webb v. Gorsuch*, 699 F.2d 157, 160 (4th Cir.1983). The Court finds the plaintiff's challenge to the resource monitoring and AMS adopted in the 2012 Decisions to be without merit, and concludes that the Forest Service did not act in an arbitrary or capricious manner in this regard.

## II. NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, "declares a national policy of protecting and promoting environmental quality" and "requires federal agencies to follow certain procedures before undertaking projects that will affect the environment." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). NEPA is designed "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The United States Court of Appeals for the Fourth Circuit has noted that "the purpose of NEPA is to sensitize all federal agencies to the environment in order to foster precious resource preservation." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 184 (4th Cir. 2005) (*citing Andrus v. Sierra Club*, 442 U.S. 347, 350–51 (1979); *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002)). "NEPA encourages conservation not by imposing substantive obligations on agencies, but by requiring that agencies consider the environmental consequences of their actions and present them to the public for debate." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1120 (4th Cir. 2014) (*citing Nat'l Audubon Soc'y*, 422 F.3d at 184-85). A court reviewing an agency's efforts in order to evaluate compliance with NEPA is tasked to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. *Webster v. U.S. Dep't. of Agriculture*, 685 F.3d 411, 421 (4th Cir. 2012); *see also Nat'l Audubon Soc'y*, 422 F.3d at 185. "What constitutes a 'hard look' cannot be outlined with rule-like precision." *Nat'l Audubon Soc'y*, 422 F.3d at 185. However, a reviewing court should apply the following guidance:

> A hard look involves, at minimum, "a thorough investigation into the environmental impacts of [the] action and a candid acknowledgement of

the risks that those impacts entail." In conducting this review, [the court] "may not 'flyspeck' [the] agency's environmental analysis, looking for any deficiency, no matter how minor." Instead, [the court] "must take a holistic view of what the agency has done to assess environmental impact" and "examine all of the various components of [the] agency's environmental analysis ... to determine, on the whole, whether the agency has conducted the required 'hard look.'"

*Webster*, 685 F.3d at 421-22 (*quoting Nat'l Audubon Soc'y*, 422 F.3d at 185-86) (internal citations omitted). In the end, the review "'requires a pragmatic judgment whether the [environmental impact statement's] form, content[,] and preparation foster both informed decision-making and informed public participation.'" *Id.* at 421 (citation omitted).

Furthermore, because the APA governs review of claims brought pursuant to NEPA, the reviewing court may set aside the agency's action only if the action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (*quoting* 5 U.S.C. § 706(2)(A)). This involves a searching and careful review of the agency's actions, but is ultimately narrow and very deferential. *Id.*; *see also Ohio Valley Envt'l Coal.*, 556 F.3d at 192. "If the agency has followed the proper procedures, and if there is a rational basis for its decision, [the reviewing court] will not disturb its judgment." *Hodges*, 300 F.3d at 445.

The plaintiff argues that the environmental analysis conducted by the Forest Service leading up to the 2012 Decisions fails to satisfy the requirements of NEPA and does not justify a FONSI. The analysis fails, they contend, because the 2012 Decisions authorize action based upon Alternative 13A from the EA, and because continued "interim" access by boaters on "erosive user-created trails" was not clearly and

accurately presented or examined in the EA's analysis of Alternative 13A. (ECF No. 53 at 34-35). In other words, the plaintiff's main complaint regarding access points is that boaters will access the headwaters of the Chattooga on user-created trails, rather than Forest Service system trails until such time as the new system trails are designated and site-specific NEPA analysis is conducted, a period that the plaintiff asserts may be indefinite. This interim arrangement fails NEPA, says the plaintiff, because it was not adequately addressed in the EA. The plaintiff further argues that the capacity limits analysis is similarly flawed because it relies on parking facility restrictions for an assurance of no increase in user-caused degradation without actually limiting an increase in parking facilities. *Id.* at 36-37. The plaintiff claims that reliance upon these analyses to establish a FONSI under NEPA was misleading, erroneous, and unjustified. *Id.* at 37-38.

The defendants respond that, contrary to the plaintiff's assertions, the Forest Service thoroughly analyzed impacts from user-created features and parking capacity and found that they were not significant. Therefore, argue the defendants, the Forest Service properly relied on the EA, in compliance with NEPA, when it issued the 2012 Decisions. The defendants maintain that by selectively quoting the EA about user-created features and selectively referencing photographs of erosion (*see* ECF No. 53 at 28-29) the plaintiff has engaged in precisely the kind of "flyspecking" of the record that the United States Court of Appeals for the Fourth Circuit has repeatedly rejected as insufficient to establish a NEPA violation. *See, e.g., Nat'l Audubon Soc'y*, 422 F.3d at 186. The Court agrees.

**A. The Sufficiency of Relying Upon the Environmental Assessment**

The initial question is whether the Forest Service appropriately relied upon the EA, rather than preparing an Environmental Impact Statement ("EIS"). NEPA requires federal agencies to prepare an EIS for major federal actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(C); 36 C.F.R. §§ 220.1-220.7 (Forest Service procedures for NEPA compliance). "'[S]ignificantly' as used in NEPA requires considerations of both context and intensity.'" *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62 (4th Cir. 1991); 40 C.F.R. § 1508.27.14. In order to determine whether an EIS is required, NEPA regulations allow for the preparation of an EA. 40 C.F.R. § 1501.3. In assessing whether a project's impacts will be significant, the agency must take a "hard look" at potential environmental consequences. *See Robertson v. Methow Valley Citzens Council*, 490 U.S. 332, 350 (1989). "If, after conducting the [EA], the [Agency] found the proposed project would not, either individually or cumulatively, have a significant impact on human health or the environment, it could make a [FONSI], obviating the need for preparing an EIS." *Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 123 (4th Cir. 2013) (*citing* 40 C.F.R. § 1508.13). "An agency's decision to rely on an [EA] instead of preparing an [EIS] is entitled to deference from the courts." *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998); *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993) ("An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review.")

The record includes sufficient evidence of environmental analysis by the Forest

Service to justify its reliance on the EA, and obviate the need for preparation of an EIS. This is true with regard to those distinct subjects of analysis that the plaintiff claims resulted in a NEPA violation: user-created features and capacity limits based on parking. The Forest Service conducted an inventory of user-created features and capacity issues in the three National Forests and summarized its findings in a report entitled "Capacity and Conflict on the Upper Chattooga River." (AR171:20679-206795). Moreover, the EA is replete with additional discussion and consideration of user-created features, capacity limits based on parking, and the putative impact of both those subjects on the Chattooga Corridor in light of the proposed alternatives for action. (AR400:16747-16836). Informed by this thorough analysis, the Forest Service determined that implementation of Alternative 13A will not have a significant effect on the human environment based on the significance criteria of both context and intensity as defined by NEPA. (AR402:17212-14; AR403:17240-42; AR404:17268-70 (FONSI evaluating context and ten intensity factors)). It is entirely unclear what further efforts the plaintiff believes the Forest Service should have taken to satisfy NEPA. The Court declines to substitute its judgment for that of the Forest Service, and must accord the Forest Service deference on its decision to rely on the EA, rather than preparing an EIS. The Court concludes that this decision was neither arbitrary nor capricious.

**B. The Sufficiency of the Analysis within the Environmental Assessment**

The next question is whether the plaintiff's critiques of the Forest Service's NEPA analysis establish a NEPA violation in that the three FONSI were ill-informed or erroneous. The Court finds that the plaintiff's assertions regarding interim use of user-created features and capacity limits based on parking facilities do not substantiate a

NEPA violation because the plaintiff has not shown that the Forest Service failed to take a "hard look" at the environmental consequences of the proposed action. On the contrary, the voluminous record supports the defendants' contention that they did just that. The plaintiff's policy preferences notwithstanding, it is simply not the case that the mere potential of negative environmental impact from agency action constitutes a NEPA violation. "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *Johnson*, 165 F.3d at 289. Furthermore, "although NEPA establishes environmental quality as a substantive goal, it is well settled that NEPA *does not mandate that agencies reach particular substantive results.* Instead, it simply sets forth procedures that agencies must follow." *Glickman*, 81 F.3d at 443 (*citing Robertson*, 490 U.S. at 350; *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978)) (emphasis added).

The plaintiff's challenges to the Forest Service's NEPA analysis are substantive in nature, and amount to policy disagreements between the plaintiff and the Forest Service. This scenario illustrates precisely why an administrative agency's decisions are entitled to deference, because the Forest Service was required to carefully balance competing interests advocated by any number of interested parties, to include parties not listed in this case caption or that of the related case *American Whitewater v. Tidwell*, C/A No. 8:09-CV-2665-MGL. When the Forest Service's Reviewing Officer granted American Whitewater's administrative appeal and directed the Regional Forester to reassess the boating prohibition as part of a broader examination of visitor use capacity

issues on the Upper Chattooga (AR054:02120-02121), the Forest Service obeyed. Subsequently, on the one hand, American Whitewater challenged the resultant 2012 Decisions under NEPA on the basis that they were not liberal enough because they did not permit unrestricted access to the outstanding opportunities for whitewater floating on the Headwaters. On the other hand, the plaintiff now challenges the 2012 Decisions under NEPA on the basis that they are vastly too liberal and unjustifiably permit boating on a portion of the Chattooga that will result in irreparable degradation of its values. The plaintiff's challenge, like American Whitewater's, fails because they have not established that the Forest Service failed to take a hard look at either the context or the intensity of the impact from the proposed action. NEPA regulations identify ten criteria that an agency should consider when evaluating the "significance" of a given impact. 40 C.F.R. § 1508.27(a). The plaintiff has not identified a single intensity criterion that the Forest Service did not examine. Even if the Court agreed entirely with the plaintiff's policy preferences regarding management of the Chattooga, we "may not substitute [our] judgment for that of the agency [but] must simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions, bearing in mind that NEPA exists to ensure a process, *not particular substantive results*." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (internal quotations and citations omitted) (emphasis added).

According to the plaintiff, the Forest Service violated NEPA because the 2012 Decisions "authorize action that was not clearly and accurately presented or examined in the 2012 EA's analysis of Alternative 13A." (ECF No. 53 at 34). The action they are asserting was not adequately examined is the interim use of established user-created

trails for boater put-in and takeout until the Forest Service designates new system trails and conducts site-specific NEPA analysis. *Id.* This claim lacks merit. Alternative 13A states:

> All of these put-ins and take-outs are accessible by existing U.S. Forest Service system trails or commonly used user-created trails. Boaters would use these obvious routes to the river until the agency has identified and/or developed a preferred route that minimizes biophysical impacts, redundancy with existing trails and user conflict. The agency would designate these put-ins and take-outs only after site-specific NEPA analysis.

(AR400:16830). Thus, it is indisputable that Alternative 13A considered and disclosed interim access along user-created trails, which is ultimately what the 2012 Decisions authorized. *See* (AR402:17201; AR403:17230; AR404:17258). The Court declines to "flyspeck" the Forest Service's environmental analysis looking for minor deficiencies. *See Webster*, 685 F.3d at 421. A holistic view of the Forest Service's environmental analysis reveals that the agency conducted "a thorough investigation into the environmental impacts of [the] action and a candid acknowledgement of the risks that those impacts entail." *Id.* On the whole, the Forest Service engaged in the requisite "hard look" which fostered informed decision making and informed public participation. *See id.* Therefore, its actions were in compliance with NEPA and were neither arbitrary nor capricious.

## III. National Forest Management Act

The National Forest Management Act of 1976 ("NFMA") requires the United States Department of Agriculture ("USDA") to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Under NFMA, the USDA must assure that National Forest plans

"provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C.A. §§ 528-531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e).

The plaintiff argues that the Forest Service has violated the NFMA by failing to comply with the LRMPs for the National Forests. They cite prescriptions from the 1994 Nantahala Forest Plan and 2004 Chattahoochee Forest Plan that essentially require trails to be constructed and maintained in a manner consistent with preserving resource values. Because, they argue, the 2012 Decisions permit interim use of non-system trails that negatively impact resource values and do not comply with Forest Service design standards, the 2012 Decisions violate the NFMA.

The defendants respond that the 2012 Decisions amended all three LRMPs to allow for interim use, and that this amendment is consistent with NFMA's multiple use mandate. The Court agrees.

The Court finds that the 2012 Decisions are indeed consistent with the LRMPs in their allowance of non-system trail use because the 2012 Decisions amended the LRMPs to permit interim access on user-created features. (AR402:17201; AR403:17230; AR404:17258). Such access to user-created trails is necessary to facilitate boater put-in and take-out until such time as new system trails are designated and site-specific NEPA analysis is complete. (AR400:16830). The Court concludes that this temporary arrangement is specifically contemplated in the revised LRMPs and reasonably tailored to facilitate compliance with the multiple use requirement in 16 U.S.C. § 1604(e). Thus, the Court grants judgment to the defendants as a matter of law.

**IV. Forest Service Access Regulations**

In 1978, the Forest Service promulgated regulations regarding access to the portions of the Chattooga River flowing through the Sumter and Chattahoochee National Forests. 36 C.F.R. § 261.77. Section 261.77 provides that using or occupying any area of the Chattooga River in the Sumter and Chattahoochee National Forests for the purpose of boating is prohibited "unless authorized by permit obtained through registration at Forest Service Registration Stations abutting the Chattooga River located at Highway 28, Low-Water Bridge, Earl's Ford, Sandy Ford, Highway 76, Woodall Shoals, or Overflow Bridge or unless authorized under special use permit." 36 C.F.R. § 261.77(a) and (d). The regulation is silent as to use or occupancy of the Chattooga River in the Nantahala National Forest. *See id.*

The plaintiff argues that the 2012 Decisions violate the Forest Service's own access regulations by directing boating users to access the river at prohibited points. Because 36 C.F.R. § 261.77 prohibits access to the Chattooga at any point other than the seven specific locations itemized in § 261.77(a) and (d), or as authorized under special use permit, the plaintiff claims that the Forest Service is in blatant violation of the regulation by facilitating access at other locations.

The defendants respond that the new boater registration kiosks at the interim access points are permissible under § 261.77. They argue that the seven locations enumerated in the regulation are neither exclusive nor exhaustive, and that § 261.77 should not be read to tie the hands of the Forest Service and prohibit additional kiosks. The defendants further contend that the self-registration model adopted for the new kiosks on the Upper Chattooga should be deemed permissible, because it is based on

37

the self-registration system for non-commercial boaters that has been in effect on the Lower Chattooga since it was first designated a WSR. Finally, they argue that the Forest Service's reading of § 261.77 is reasonable and entitled to deference by the Court, especially in light of the fact that the Forest Service has already been interpreting the regulation in this way for some time by allowing three non-enumerated boater registration stations on the Lower Chattooga. The Court agrees.

Judicial review of an agency's interpretation of its own regulations is limited to assessing the reasonableness of the interpretation. *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 193 (4th Cir. 2009). "This kind of review is highly deferential, with the agency's interpretation 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* (*quoting Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003) (noting that, when reviewing an agency's interpretation of its own regulation, "[t]he reviewing court does not have much leeway"). When applying these principles, the reviewing court "must first determine whether the regulation itself is unambiguous; if so, its plain language controls." *Id.* (*citing Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003)). If, on the other hand, the regulation is ambiguous, deference is applied. *Id.* at 193-94 (*citing Christensen*, 529 U.S. at 588; *Deaton*, 332 F.3d at 709).

The Court finds that the Forest Service's interpretation of § 261.77 in permitting river access by way of new boater registration kiosks is reasonable. Surely all parties can agree that § 261.77 is *unambiguous* regarding boater access to the Chattooga without a permit – it is not allowed. On this point the plain language of the regulation

38

controls. Thus, if the 2012 Decisions had amended the LRMPs to allow river access on the Headwaters without user registration then the Forest Service would indeed be violating its own access regulations – but that is not what happened. Rather, the 2012 Decisions set up precisely the same user registration model for the Upper Chattooga that has long been in place on the Lower Chattooga. (AR400.16733, 16735 (noting that user registration requirements for the Headwaters are the same as current management below Highway 28)).

Where § 261.77 *is ambiguous*, on the other hand, is with respect to whether the list of registration station locations is exclusive and exhaustive. On this point, the Forest Service's interpretation of the regulation is entitled to substantial deference. *See Ohio Valley Envt'l Coal.*, 556 F.3d at 193-94. It was reasonable for the Forest Service to conclude that the itemized list in § 261.77(a) and (d) was descriptive of the state of the Chattooga Corridor at the time the regulation was drafted, and not intended as a normative prescription on the maximum number or location of registration stations. The reasonableness of this interpretation is bolstered by the fact that the Forest Service has been managing boater registration on the Lower Chattooga by way of three additional, non-enumerated registration stations for some time without challenge. (AR467:20110-20111). What emerges from this analysis is that the purpose of § 261.77 is to prevent unregistered river access, not to circumscribe the Forest Service's elections regarding where to locate registration kiosks. One can, of course, also note that the regulation certainly could have included language explicitly limiting the registration locations to the seven points listed. It did not, and the Court will not read such a limiting principle into the text. The Court declines to play "gotcha" regarding the fact that the new kiosk

locations are not specifically itemized in § 261.77. If the Code of Federal Regulations had to be amended every time a LRMP revision created a minor omission regarding site-specific management instructions nothing would ever get done. The Forest Service's interpretation was not plainly erroneous or inconsistent with the regulation, and is therefore entitled to deference. The Court grants judgment to the defendants on this issue.

## **CONCLUSION**

After careful consideration of the administrative record, the arguments by the parties, the memoranda submitted and the applicable law, the Court finds that the Forest Service's 2012 Plan for Management of the Chattooga WSR complies with the federal law analyzed above. As such, the defendants' cross-motion for judgment on the administrative record (ECF No. 54) is GRANTED and the plaintiff's motion for summary judgment (ECF No. 52) is DENIED. All other pending motions are DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

September 29, 2015
Greenville, South Carolina